Revised May 22, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-60267
_____


UNITED STATES OF AMERICA

                            Plaintiff - Appellant

     v.

SOUTHLAND MANAGEMENT CORPORATION; ET AL

                            Defendants

W. THAD MCLAURIN; CHARLES C. TAYLOR, JR; ARTHUR W. DOTY

                            Defendants - Appellees

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

April 11, 2002

Before KING, Chief Judge, and REAVLEY and JONES, Circuit Judges.

KING, Chief Judge:

     Plaintiff-Appellant the United States of America ("the

Government") brought the instant action against Defendants-

Appellees W. Thad McLaurin, Charles C. Taylor, Jr., and Arthur W.

Doty ("the Defendants") under the civil False Claims Act ("the

FCA"). The Government alleges that the Defendants, as owners of the Jackson Apartments in Jackson, Mississippi, repeatedly certified falsely to the Department of Housing and Urban Development ("HUD") that these apartments complied with the "decent, safe, and sanitary" standard established in the Defendants' contract with HUD. The district court granted summary judgment to the Defendants, finding that, under the undisputed material facts of the case, the Government could not establish the materiality element of a cause of action under the civil FCA: namely, that the false claims in question "had a natural tendency to influence" or were "capable of influencing" the decision of the governmental body to which they were addressed. The district court also found that, because HUD remitted funds to the Defendants knowing that their certifications were false, the Defendants could not have "knowingly" submitted false claims to HUD. The Government now appeals the district court's summary judgment, alleging that materiality is not a required element of a cause of action under the civil FCA and that genuine issues of material fact exist regarding whether the Defendants "knowingly" submitted false claims.

We hold that, under the law of this circuit, materiality is a required element of a cause of action under the civil FCA. However, we find that summary judgment was nonetheless inappropriate in the instant case because this court's precedents

also dictate that the Defendants' false certifications of compliance with the "decent, safe, and sanitary" standard were material as a matter of law. Using the definition of materiality employed by the Supreme Court in Kungys v. United States, 485 U.S. 759 (1988), which is the definition employed by the district court, we find that the Defendants' certifications had a "natural tendency to influence, or were capable of influencing" HUD's decision whether to honor their claims because receipt of these certifications was a prerequisite to HUD's remittance of funds. We also hold, in accordance with the conclusion of our sister circuits, that government payment of a false claim with knowledge of its falsity does not provide an automatic defense to liability under the FCA. Finally, we agree with the Government that there are genuine issues of material fact regarding whether the Defendants "knowingly" submitted false claims to HUD in the instant case. Accordingly, we REVERSE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 1980, the Defendants participated in a federally-funded program to provide housing to low-income individuals at the Jackson Apartments ("the Complex") under the oversight of HUD. During subsequent years, conditions at the Complex deteriorated. While HUD attempted to work with the

Defendants over a period of approximately two years to remedy these problems, these informal remedial efforts met with increasing resistence and ultimately proved unsuccessful in improving the habitability of the Complex.  In 1997 the Defendants stopped making payments on the building's mortgage debt, and HUD foreclosed on the Complex.  The Government subsequently sued the Defendants, alleging that during a nineteen month period (beginning after the two-year remedial efforts had substantially deteriorated, but prior to HUD's ultimate foreclosure) the Defendants violated 31 U.S.C. § 3729(a) by falsely certifying on nineteen separate occasions that the Complex was in "decent, safe, and sanitary" condition.  An explanation of HUD's low-income housing program provides a context for the relevant facts.

## A. HUD's Housing Program

### 1. The National Housing Act and Regulatory Agreements

In enacting the National Housing Act, Pub. L. No. 73-479, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701-1750g (2001)) (the "NHA"), Congress sought to increase the supply of low-income housing by creating a program that provides mortgage credit to the private sector.  Under this program, HUD insures a housing project owner's mortgage so that the owner may provide low-rent housing "to assist families with incomes so low that they could not otherwise decently house themselves."  12 U.S.C.

4

§§ 1701t, 1703 (2001).  In an effort to encourage private investment, the NHA and HUD regulations also "allow[] owners to borrow money at reduced interest rates, reduce[] a borrower's equity requirements, permit[] owners to sign non-recourse notes, and, prior to the 1986 tax code changes, grant[] owners and investors generous tax benefits."  Christopher Vill., Ltd. P'ship v. Retsinas, 190 F.3d 310, 312 (5th Cir. 1999).[1]

---

[1]  Because of the significant tax benefits involved, this program became a popular source of "tax shelters" for individual investors in the early 1980s.  Frequently such tax shelters were structured as limited partnerships, as in the instant case. Typically, individuals formed a limited partnership, made a minimal initial capital contribution, and obtained a non-recourse mortgage guaranteed by the federal government to cover the bulk of the costs of building or rehabilitating a property.  While the limited partners were liable only to the extent of their initial capital investment, the partnership was a "pass through" entity for tax purposes – i.e., the partnership allocated gains or losses to individual partners, who reported such items on their individual tax returns.  Because the tax laws allowed the partnership to depreciate the building (or the improvements to an existing property) on an accelerated timetable, these projects tended to accrue large "losses" in their early years.  The individual members of the partnership used these "passed through" losses to offset individual income, thereby "purchasing" more than one dollar of tax savings with each dollar of capital they contributed.  At the same time, the excess cash flows generated by the project during its early years were paid out to the partnership rather than preserved for the support of the project.
When the accelerated depreciation period was over and the shelter had (in the vernacular) "burned out," if the partnership defaulted on the mortgage (because of inadequate cash flow or any other reason), HUD (as guarantor) was compelled to institute proceedings to foreclose on the property.  This default did not put the investors' personal assets at risk, as the mortgage was non-recourse debt.  See generally Arthur R. Hessel, Heard from HUD, 6 SUM J. Affordable Housing & Community Dev. L. 268, 270 (1997) (describing the tax incentives for private investors to participate in construction and rehabilitation of low-income housing); Daryl S. Alterwitz, Low Income Housing Under the New Conservatism: Trickle Down or Dry Up?, 26 Santa Clara L. Rev.

In exchange for these benefits, the property owner and HUD execute a regulatory agreement that "give[s] HUD extensive regulatory authority over the operation and maintenance of the property." Id.; see also 12 U.S.C. § 1715l(d)(3) (requiring the owners to be "regulated or supervised . . . under a regulatory agreement or otherwise, as to rents, charges, and methods of operation, in such form and in such manner as in the opinion of the Secretary [of HUD] will effectuate the purposes of this section"). The owner has many responsibilities under the regulatory agreement. For example, the regulatory agreement in the instant case requires the Defendants to "maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition."

### *2. Section 8 and "HAPs"*

In 1937, Congress enacted the United States Housing Act, Pub. L. No. 75-412, 50 Stat. 889 (1937) (codified as amended at 42 U.S.C. §§ 1437 et seq. (1994 & Supp. 2001)) (the "USHA"), "to address the shortage of housing affordable to low-income

---

461, 461 & nn. 5, 6, 23 & 93-96 (1986) (same).
    Such tax shelters were particularly financially advantageous prior to the Tax Reform Act of 1986, which restricted the extent to which investors could use deductions and credits derived from tax shelters to offset earned income. These reforms also repealed some of the specific tax incentives applicable to low-income housing projects. See generally Janet Stearns, The Low-Income Housing Tax Credit: A Poor Solution to the Housing Crisis, 6 Yale L. & Pol'y Rev. 203, 208-10 (1988) (describing the effects of the Tax Reform Act of 1986).

families" and "to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families." 42 U.S.C. § 1437(1) (Supp. 2001). In 1974 Congress amended the USHA by adding Section 8 (codified as amended at 42 U.S.C. § 1437f (Supp. 2001)), which created a federal program to provide rental assistance for tenants of privately-owned housing.[2] Id. § 1437f(a); Christopher Vill., 190 F.3d at 313. Generally, under this rent subsidy program, a low-income tenant will make rental payments based upon the tenant's income and ability to pay. See 42 U.S.C. § 1437a(a)(1) (1994 & Supp. 2001).

---

[2] There are many Section 8 programs. See, e.g., 24 C.F.R. §§ 880.101-880.612a (2001) (new construction); id. §§ 881.101-881.601 (substantial rehabilitation); id. §§ 882.101-882.810 (moderate rehabilitation); id. §§ 883.101-883.701 (state housing agencies). Each program has its own specific rules and eligibility requirements. In the present suit, we are concerned with the Section 8 program involving substantial rehabilitation. See id. §§ 881.101-881.601. Section 881.201 defines "substantial rehabilitation" as:

(a) The improvement of a property to decent, safe and sanitary condition in accordance with the standards of this part from a condition below those standards. Substantial rehabilitation may vary in degree from gutting and extensive reconstruction to the cure of substantial accumulation of deferred maintenance. Cosmetic improvements alone do not qualify as substantial rehabilitation under this definition.
 (b) Substantial rehabilitation may also include renovation, alteration or remodeling for the conversion or adaptation of structurally sound property to the design and condition required for use under this part or the repair or replacement of major building systems or components in danger of failure.

Id. § 881.201.

HUD then pays the property owner an amount calculated to make up the difference between the tenant's contribution and the "contract rent" agreed upon by HUD and the owner. See id. § 1437f(c)(3). These monthly payments to the owner are known as housing assistance payments, or "HAPs."

Pursuant to Section 8 and as required by the regulations governing the substantial rehabilitation program, see 24 C.F.R. § 881.501 (2001), HUD enters into Housing Assistance Payment contracts ("HAP contracts") with private owners. These contracts require the owners to agree to maintain "decent, safe and sanitary" housing in order to receive HAP payments from the government. Once such a contract is established, the owner submits to HUD a monthly Application for Housing Assistance Payments, also known as a "HAP voucher." See 24 C.F.R. § 881.501(c) (2001). Part of this application requires the owner to sign an "Owner's Certification," certifying, inter alia, that the subject property is "decent, safe, and sanitary."[3] The

---

[3] The HAP vouchers require that the owners of the federally-subsidized properties provide information regarding the number of total units, the number of vacant units, the contract rent amount, the amount of rent paid by the tenants, and the amount of payment requested by the owners. There are also other certifications that the property owners must make, including that the information provided in the HAP voucher is true and correct; that the "tenant's elig[ibility] and ass[istance] was computed in accordance with HUD's reg[ulations], procedures, and the Contract"; that "required inspections are complete"; and that the owners "have not and will not receive any money or other consideration from tenant or other source for Units beyond that authorized by HUD[.]"

8

government remits the monthly HAPs only if the owner has signed this certification. The HAP vouchers submitted by the owner also indicate, immediately above the signature line, that HUD has the right to "prosecute false claims/statements" and to seek civil penalties pursuant to § 3729 of the civil False Claims Act.

If a property does not meet the required specifications, HUD's usual practice is to require the owner to submit a detailed plan indicating how the owner will remedy the defects and to allow the owner a limited time period to fix the problems pursuant to this plan. However, under the HAP contract, if the owner fails to cooperate with HUD and correct the violations within the prescribed time, HUD may exercise any of its rights or remedies under the HAP contract, including abatement of the HAPs.

### B. The Facts of the Present Suit

The Defendants were general partners of Jackson Apartments, Ltd. (the "Partnership"), a limited partnership created for the purpose of purchasing the Complex. In 1980, HUD advertised for bid proposals for properties to participate in its Section 8 "substantial rehabilitation" program. The Partnership purchased the Complex and submitted a proposal to HUD, which HUD selected. The Partnership then renovated the Complex, and the Complex opened to low-income tenants in 1981.

To fund the renovation of the Complex, the Defendants expended approximately $190,000 of their own funds, and the Partnership executed a $2.4 million note secured by a HUD-insured

9

non-recourse mortgage.  To enjoy the benefits of the low-interest, non-recourse mortgage, the Partnership entered into a regulatory agreement with HUD.  The Partnership and HUD also executed a HAP contract so that the Partnership could receive HAPs.  During the time period between the opening of the Complex and HUD's foreclosure in 1997, the Defendants withdrew $1,109,213 in surplus cash from the project while simultaneously accruing significant tax benefits from the tax credits and accelerated depreciation schedule applicable to the property.

Shortly after the inception of the project, in December 1983, the Partnership contracted with Southland Management Company ("Southland") to manage the Complex.  During the time period relevant to this litigation (i.e., July 1995 to January 1997) Southland submitted, on behalf of the Partnership, the monthly HAP vouchers to HUD.  As noted above, each of these HAP vouchers contained a certification that the property was in decent, safe, and sanitary condition.  An employee of Southland, as an agent of the Partnership, would sign the monthly certification.

Beginning at least as early as August 1993, physical inspections conducted by HUD revealed many maintenance problems and structural defects at the Complex.  The physical inspection reports contained in the record demonstrate that the Complex suffered from, inter alia, roach and rodent infestation, deteriorated siding, drainage problems, doors and windows that

10

would not close or lacked functioning locks, inadequate maintenance of fire extinguishers, inoperable smoke alarms, rusted medicine cabinets, and leaking faucets and toilets.[4] These deficiencies were reflected in the overall ratings of "below average" or "unsatisfactory" given to the Complex from August 31, 1993 to November 12, 1996. Furthermore, a December 20, 1996 HUD Management Review Report rated the complex as "unsatisfactory," the lowest rating provided for in the management review and physical inspection reports.[5]

---

[4]    While the dissent downplays the severity of these problems, the record provides ample evidence that conditions at the Complex were deplorable. One resident attested that she would catch ten or more rats in her apartment every day and that the rats would crawl in her baby's crib, chew the nipples off the baby's bottles, and drink the baby's milk. Another resident indicated that roaches were so prevalent in her home that they had infested her bed. She would kill roaches inadvertently while she was sleeping by rolling over in her sleep. A third resident stated that, in addition to problems with roaches and mice, her apartment had non-functional plumbing, holes in the walls, doors with no doorknobs, and windows that could not be locked.
    Crime at the Complex was alarmingly high as well. Drug related crimes were particularly prevalent. In 1995 alone, the Jackson Police Department received 43 calls reporting narcotics violations at the Complex and the police made arrests at the Complex on at least 17 different occasions for narcotics violations. Non-drug-related crimes were also common at the Complex. In one two-year interval during the time period relevant to this litigation, the Jackson Police Department's records indicate 57 cases of aggravated or simple assault, 12 auto burglaries, 26 house burglaries, 9 auto thefts, 1 armed robbery, 17 cases of vandalism, 1 murder, 14 larcenies, and 2 rapes at the Complex.

[5]    The record contains reports from inspections conducted by the Defendants' mortgage company giving the Complex "satisfactory" ratings during the relevant time period. However, as John Maertz, the Government's expert witness, indicated in his report, mortgage company inspections tend to be far shorter and

The Defendants received prompt written notice of each of these unsatisfactory inspection reports. As per its standard practice, HUD attempted to give the Defendants a limited opportunity to cure the defects rather than immediately abating the HAP payments. After each inspection, HUD informed the Defendants that they were required to "submit a written response to deficiencies noted" in the inspection report, explaining "in detail" the corrective measures planned, underway, or completed. While Defendants timely provided such a detailed response in 1993, in subsequent years the cooperative remedial process began to break down, and the Defendants' responses to HUD's notifications became increasingly less timely and more cursory.[6]

less thorough than the inspections conducted on behalf of HUD. Consistent with this assessment, the mortgage company's inspector, Joseph Toler, voluntarily characterized his own inspection as "cursory" in his deposition, indicating that he did not look at every building in the Complex and that, for the buildings he did examine, he "would be like walking in the door and looking around . . . and saying, well, this isn't too bad" and then leaving.

[6] For example, on August 7, 1995, HUD sent to the Defendants a July 11, 1995 physical inspection report and requested a "detailed" written response. The Defendants responded on September 6, 1995, in a brief letter that touched on only a few of the reported deficiencies. On September 11, 1995, HUD wrote to the Defendants, informing them that their letter of September 6 failed to provide the "detailed plan of action" that HUD requested in its August 7 letter. HUD again requested a detailed response, this time within fifteen days. On October 17, 1995, still not having received any response from the Defendants, HUD wrote a third request for a detailed plan, giving the Defendants another fifteen days to respond. In reply, HUD received from the Defendants a rather indignant letter stating in two short paragraphs which deficiencies noted in the inspection report had been corrected.

12

Despite the significant health and safety problems at the Complex and the inadequacy of the Defendants' recalcitrant repair and improvement efforts, the Defendants continued to submit their monthly HAP vouchers certifying that the property was in "decent, safe, and sanitary condition," and HUD continued to disburse HAPs to the Defendants.  On August 5, 1997, however, the Defendants informed HUD that they would make no more payments on the mortgage.  HUD consequently foreclosed, and the Complex was sold in late July 1998.  On August 5, 1998, the Government filed the instant action under § 3729(a) of the civil False Claims Act, alleging that the Defendants made false claims each month regarding the physical condition of the Complex when they submitted HAP vouchers for payment.  The Government's lawsuit seeks recovery only for false claims made between July 1995 (when HUD's cooperative remedial efforts began to encounter substantial resistance from the Defendants) and January 1997.[7]

Specifically, the Government argues that during this time period the Defendants submitted nineteen HAP vouchers falsely certifying that the Complex was decent, safe, and sanitary.  The Government contends that each of these voucher submissions

---

[7]  We note that the Government does <u>not</u> seek to recover for any false claims made during the time period when the Defendants complied in good faith with HUD's informal remedial efforts.

constitutes a false claim[8] under the Act and that the certifications therein indicating that the property was in decent, safe, and sanitary condition were false statements made to secure HUD's payment of the HAP vouchers. The Government seeks civil penalties of $10,000 for each certification that was filed, plus treble damages of $2,595,069.[9]

On September 7, 1999, the Defendants moved for summary judgment, arguing that: (1) the HAP certifications were not material to HUD's decision to pay the subsidies and therefore could not form the basis of a "false claim"; (2) the Defendants did not "knowingly" submit false claims because the Defendants knew that HUD was fully aware of the condition of the Complex during the relevant time period; and (3) the "decent, safe, and sanitary" language is too ambiguous to support a finding of liability under the False Claims Act. The district court granted the Defendants' motion for summary judgment, agreeing with their first two arguments.

The Government timely appeals the district court's summary judgment in favor of the Defendants. The Government asserts two

---

[8] The civil False Claims Act defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property . . . [where] the United States Government provides any portion of the money or property." 31 U.S.C. § 3729(c) (Supp. 2001).

[9] The Government reaches this figure by trebling $865,023 — the amount that HUD claims to have disbursed to the Defendants during the time period covered by its complaint.

14

primary claims of error: (1) that the materiality of the falsehood to HUD's decision is not relevant in determining whether the Defendants violated 31 U.S.C. § 3729(a); and (2) that genuine issues of material fact exist regarding whether the Defendants "knowingly" submitted the false claims.  We address each of these claims in turn.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment <u>de novo</u>, applying the same standard as the district court.  <u>See</u> <u>Rivers v. Cent. & S.W. Corp.</u>, 186 F.3d 681, 683 (5th Cir. 1999).  "Summary judgment is proper only 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  <u>Turner v. Houma Mun. Fire & Police Civil Serv. Bd.</u>, 229 F.3d 478, 482 (5th Cir. 2000) (quoting FED. R. CIV. P. 56(c)).

"Courts of Appeals consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleadings; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial."  <u>Spivey v. Robertson</u>, 197 F.3d 772, 774-75 (5th Cir. 1999) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,

15

248-49 (1986)).  After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable factfinder could find for the nonmovant, summary judgment is appropriate.  See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III. IS "MATERIALITY" AN ELEMENT OF A CAUSE OF ACTION UNDER THE CIVIL FALSE CLAIMS ACT?

The civil False Claims Act imposes liability on any person who knowingly submits, or causes the submission of, a false or fraudulent claim for money to the government.  The current Act originated in the 1863 False Claims Act, which provided both civil and criminal sanctions for "false, fictitious, or fraudulent" claims submitted to the United States Government. See Act of Mar. 2, 1863, ch. 67, 12 Stat. 696; see also S. REP. NO. 99-345, at 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273.  In 1874, the civil and criminal provisions were severed, the civil penalties being codified in one portion of the United States Code and the criminal provisions in another.  See U.S. REV. STAT. tit. 36, § 3490 (1875) (civil); id. tit. 70, § 5438 (criminal).

Congress recodified the civil False Claims Act in 1982.  See H.R. REP. NO. 651 (1982), reprinted in 1982 U.S.C.C.A.N. 1895, 1895.  In this 1982 recodification, Congress eliminated the word "fictitious" and retained the prohibition on "false or fraudulent

16

claim[s]." See 31 U.S.C. § 3729 (1982).[10] Congress also significantly revised the civil FCA in 1986, clarifying that a showing of specific intent to defraud is not required for liability under the Act. See 31 U.S.C. § 3729(b) (Supp. 2001).[11]

In its current form, the Act provides, in pertinent part:

Any person who–

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

---

[10] The minor textual changes that accompanied this recodification were designed only to "eliminate unnecessary words" and provide "consistency," rather than to enact any substantive change. See H.R. REP. NO. 97-651, at 142 (1982), reprinted in 1982 U.S.C.C.A.N. 1895, 1896.

[11] The 1986 amendments also: (1) clarified that the government need establish the elements of a cause of action under the Act only by a preponderance of the evidence; (2) lengthened the statute of limitations under the Act beyond six years in cases where the government fails to detect the false claims at the time they are submitted; (3) increased the penalties under the Act from $2000 per claim to between $5000 and $10,000 per claim; (4) increased the Act's damages provision, authorizing courts to award the government treble damages; and (5) expanded the role of (and the rewards available to) qui tam relators under the Act. See generally John T. Boese, Civil False Claims and Qui Tam Actions § 104 (2d ed. 2000 & Supp. 2001) (describing the impact of the 1986 amendments).

17

31 U.S.C. § 3729(a) (Supp. 2001). For the Defendants to be liable under § 3729(a)(1), courts agree that the Government must demonstrate that: (1) the Defendants made a claim against HUD; (2) the claim was false or fraudulent; and (3) the Defendants knew the claim was false or fraudulent. See, e.g., United States v. Basin Elec. Power Coop., 248 F.3d 781, 803 (8th Cir. 2001); United States ex rel. Oliver v. The Parsons Co., 195 F.3d 457, 461 (9th Cir. 1999); United States v. Burns, 162 F.3d 840, 850 (5th Cir. 1998). Similarly, to recover against the Defendants under § 3729(a)(2), the Government must show that (1) the Defendants made a record or statement in order to get HUD to pay money; (2) the record or statement was false or fraudulent; and (3) the Defendants knew it was false or fraudulent. See, e.g., United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999).

Although the statute contains no express reference to materiality, many courts, including this court, have found that there is a fourth, "materiality" element required to maintain a cause of action under the Act. See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997) ("[T]he FCA 'interdicts material misrepresentations made to qualify for government privileges or services.'") (quoting United States ex rel. Weinberger v. Equifax, Inc., 557 F.2d 456, 461 (5th Cir. 1977)); see also Luckey v. Baxter Health

18

Care Corp., 183 F.3d 730, 732 (7th Cir. 1999); United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala., 104 F.3d 1453, 1459 (4th Cir. 1997); United States v. Intervest Corp., 67 F. Supp. 2d 637, 646 (S.D. Miss. 1999). But see United States ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 415 (3d Cir. 1999) (noting in dicta that "perhaps" there is no materiality requirement under the FCA); United States ex rel. Roby v. The Boeing Co., 184 F.R.D. 107, 112 (S.D. Ohio 1998) (finding that materiality is not a required element of proof in actions under the FCA). In examining statutes similar to the civil FCA, the Supreme Court has defined "material" as "ha[ving] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed." United States v. Wells, 519 U.S. 482, 489 (1997) (alterations in original) (internal quotations omitted) (quoting Kungys v. United States, 485 U.S. 759, 770 (1988)). A number of courts finding a materiality element in the civil FCA have interpreted the Supreme Court's definition in Kungys to require "outcome materiality" – i.e., that a falsehood or misrepresentation must affect the government's ultimate decision whether to remit funds to the claimant in order to be "material." These courts have interpreted the civil FCA similarly to require "outcome materiality." See, e.g., Berge, 104 F.3d at 1459-60; Intervest, 67 F. Supp. 2d at 646-48; cf. Luckey, 183 F.3d at 732-33 (not

19

specifically referencing <u>Kungys</u>, but suggesting that an omission must be "material <u>to the United States' buying decision</u>" to support liability under the Act) (emphasis added). In contrast, at least one court has suggested a slightly different, "claim materiality" requirement – i.e., that a falsehood or misrepresentation must be material to the defendant's <u>claim of right</u> in order to be considered "material" for the purposes of the FCA. <u>See</u> <u>United States ex rel. Wilkins v. North American Constr. Corp.</u>, 173 F. Supp. 2d 601, 630 (S.D. Tex. 2001).[12]

---

[12] While the dissent disputes this characterization of <u>Wilkins</u>, the <u>Wilkins</u> opinion contains ample evidence indicating that court's intent to espouse a "claim materiality" requirement. Initially, the court in <u>Wilkins</u> repeatedly characterizes the FCA's materiality element to require that a false submission bear on the claimant's entitlement to payment. <u>See, e.g.</u>, 173 F. Supp. 2d at 622 (characterizing <u>Weinberger</u> to suggest a requirement that "the misrepresentation made had to bear on, or be material to, the entitlement to payment"); <u>id.</u> at 623 ("A statement or action in or related to a claim makes the claim itself false only if it bears on, or is material to, the person's entitlement to the money or property claimed."); <u>id.</u> at 624 ("[T]he FCA implicitly requires statements or conduct that are material to the person's entitlement to the money or property claimed before liability can arise."); <u>id.</u> at 630 ("Liability for both a 'false claim' and a 'fraudulent claim' implicitly requires a showing that what makes the claim either false or fraudulent is material to the asserted claim of entitlement to receive money or property from the government."); <u>id.</u> at 635 (faulting the government for failing to demonstrate "how the alleged 'padding' of waste costs was <u>material to the defendants' entitlement</u> to be paid by the government on the contract") (emphasis added). In its extended discussion of the materiality issue, the <u>Wilkins</u> court <u>never</u> suggests that a false submission must have actually affected the government's ultimate decision to remit funds in order to be "material."

Moreover, interpreting the <u>Wilkins</u> opinion to espouse an "outcome materiality" requirement would be inconsistent with the underlying rationale of that opinion. The <u>Wilkins</u> court determined that – despite the absence of any statutory reference

20

While this court has indicated that the Act contains a materiality element, we have not yet clarified the exact nature of this requirement.[13]

_____

to materiality – the civil FCA contains an implicit materiality requirement. This determination was based on the court's conclusion that materiality is inherent in the concept of a "false claim." Id. at 623-24. According to the Wilkins court, a false claim is distinguishable from a false statement because the former requires that the "claim itself must be false or fraudulent." Id. at 623. The defining characteristic of a "false claim" is that the claimant is not actually entitled to the money or property claimed. Thus, the Wilkins court concluded that a false or misleading statement renders a claim "false" only if that falsehood implicates the claimant's entitlement or right to the benefit in question. Id. at 624. The actual impact of the falsehood on the government's subsequent decisionmaking process did not play any role in the Wilkins court's analysis. Indeed, the Wilkins court specifically rejected the suggestion (made by the government in that case) that the FCA's implicit materiality requirement should turn on whether the government would have approved the claim in question but for the alleged falsehood. Id. at 636. The fact that the government would not have ultimately approved the contract in question but for the alleged false statements was not dispositive to the Wilkins court.

[13] The dissent suggests that this court is bound by the Supreme Court's decision in Kungys to find that the FCA's implicit materiality requirement must be an "outcome materiality" requirement. While we emphasize that we need not decide the exact nature of the FCA's materiality requirement in the instant case, we note that Kungys is not dispositive on this issue. In Kungys, the Court considered the meaning of the term "material" in the context of the Immigration and Nationality Act, which provides for the denaturalization of citizens whose citizenship orders and certificates of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation. See 8 U.S.C. § 1451 (1994). To discern Congress's intended meaning of the word "material," the Court looked to the common law definition of the word, reasoning that "'[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" Kungys, 485 U.S. at 770 (quoting NLRB v. Amax Coal Co., 453 U.S. 322, 329

21

The district court concluded that the civil False Claims Act contains an outcome materiality requirement. United States v. Southland Mgmt. Corp., 95 F. Supp. 2d 629, 637 (S.D. Miss. 2000). The district court then determined that "undisputed evidence" demonstrated that the Defendants' certifications in the HAP vouchers, if false, were not material to HUD's decision to disburse HAPs to the Defendants. The court thus granted summary judgment in favor of the Defendants on this ground. See id. at 643.[14]

On appeal, the Government contends that the civil False Claims Act does not contain the type of "outcome materiality" element espoused by the district court, requiring a plaintiff to

---

(1981)). Based on its review of the common law, the Court determined that "a concealment or misrepresentation is material if it 'has a natural tendency to influence, or was capable of influencing, the decision of' the decisionmaking body to which it was addressed." Id. at 770 (quoting Weinstock v. United States, 231 F.2d 699, 701 (D.C. Cir. 1956)). However, the reasoning espoused by the Court in Kungys is inapplicable to the instant case. The word "material" does not appear in the civil FCA – the materiality requirement that courts have imposed upon the Act is entirely implicit. Accordingly, unlike the Court in Kungys, we cannot draw conclusions about the nature of the materiality requirement that is implicit in the Act by relying on Congress's presumed invocation of the common law meaning of the word "material."

[14] Specifically, the district court found that, given the physical inspection reports, HUD was aware of the condition of the Complex during the relevant time period and "would have approved payment on the vouchers regardless of the condition of the property." Southland Mgmt. Corp., 95 F. Supp. 2d at 633. The district court concluded that, for these reasons, "it follows that defendants' certifications were not 'material' to HUD's decision to continue housing assistance payments to defendants pursuant to their HAP vouchers." Id.

demonstrate that the misstatement influenced the government's (i.e., HUD's) ultimate decision whether to remit funds to a defendant.  The Government argues that the Supreme Court's recent decisions in Wells and Neder v. United States, 527 U.S. 1 (1999), counsel against the existence of such a materiality requirement.[15]  Instead, the Government maintains that proving a "false claim" under the Act requires the Government to demonstrate only that the alleged falsehood was relevant to the Defendants' claim of right or entitlement.[16]

We need not decide today what the nature of the FCA's materiality requirement might be.  We find that, even under the stricter "outcome materiality" definition applied to the civil FCA by the district court and the courts in Berge and Luckey (as opposed to the "claim materiality" definition urged by the Government and adopted by the court in Wilkins), the Defendants' signed certifications in the HAP vouchers were material to HUD's decision to disburse HAPs to the Defendants.  If false, these

---

[15]  While we do not reach this issue today, we note that if a future panel of this court is faced squarely with the question whether materiality is an element of the civil FCA, this court will need to assess whether and to what extent Wells and Neder might undermine our precedents interpreting the civil FCA to contain an implicit materiality requirement.

[16]  We note that this argument mirrors the analysis of the Wilkins court.  While the Wilkins court calls this implicit requirement a "materiality" element and the Government does not, it appears that the "claim materiality" element espoused by the court in Wilkins is the same requirement advocated by the Government in the instant case.

23

certifications render the HAP vouchers "false claims" <u>as a matter of law</u> under the law of this circuit.

It is undisputed that the Defendants' legal entitlement to HAP payments is dependant upon the condition of the Complex. The HAP contract contains a covenant requiring the Defendants to maintain the property as decent, safe, and sanitary housing, under penalty of loss of their HAP payments. Moreover, the HAP contract specifically requires the Defendants to certify their compliance with this standard in each monthly HAP voucher.

The Defendants concede that they would not have received the monthly HAP payments if they had not signed these certifications. Indeed, the record contains uncontroverted testimony indicating that HUD will not remit funds to a claimant if the claimant's HAP voucher does not contain a signed certification that the property is in decent, safe, and sanitary condition. Thus, the certification of the property's condition was unquestionably "material" in the sense that it had the potential to influence HUD's ultimate decision whether to remit funds to the Defendant.

Both this court and the Ninth Circuit have recognized that, when the government conditions payment of a claim upon a claimant's certification of compliance with a statutory or regulatory condition, a claimant submits a false claim <u>as a matter of law</u> when he or she falsely certifies compliance with that condition. In <u>Thompson</u>, this court considered the question whether a claim for services rendered in violation of the

24

Medicare anti-kickback statutes necessarily constitutes a false claim. While we noted that a claim is not necessarily "false" simply because it involves a statutory violation, we indicated that a claim is necessarily false when it involves a knowingly false certification of compliance with a statute or regulation and that certification is a prerequisite to payment of the asserted claim. See Thompson, 125 F.3d at 902 ("[W]here the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation."); see also United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996) (recognizing that, while not all breaches of contract or regulatory violations automatically give rise to liability under the FCA, "the false certification of compliance . . . creates liability when certification is a prerequisite to obtaining a government benefit") (emphasis in original). We ultimately remanded Thompson to the district court because we were unable to determine from the record whether the certifications of compliance at issue in that case were actually prerequisites to the defendant's entitlement to the funds claimed. Thompson, 125 F.3d at 902-03. However, our disposition of this claim clearly indicates that if a certification of compliance with a statute or regulation is a prerequisite to the defendant's legal entitlement to funds, the certification is a

25

material misrepresentation and renders the claim false as a matter of law.  Accord Weinberger, 557 F.2d at 461 (concluding that a claim for services allegedly rendered in violation of the Anti-Pinkerton Act could not have involved a "material misrepresentation" because the government did not require claimants to make any express representations as to their compliance with the Anti-Pinkerton Act).

Thompson governs our disposition of the instant case.  We recognize today that when the government has conditioned payment of a claim upon a claimant's certification of compliance with a provision of a contract entered into pursuant to a regulation, a claimant submits a false claim as a matter of law when he or she falsely certifies compliance with that provision.  In the instant case, the government has conditioned HAP payments upon an owner's certification of compliance with the "decent, safe, and sanitary" standard established in the HAP contract mandated by 24 C.F.R. § 881.501.[17]  Accordingly, if the Defendants falsely certified

---

[17]   In discussing HUD employee Quentin Lewis's deposition testimony, the dissent apparently contends that a false certification of statutory or regulatory compliance cannot be a "prerequisite" to receipt of government funds under Thompson unless the person who processed the certifications took into account the truth or falsity of the certified statements in determining whether to remit funds.  However, the fact that the particular bureaucrat charged with confirming whether a claimant has complied with a certification requirement has no independent knowledge of the truth or falsity of the certified statements does not alter the fact that the certification is a prerequisite to receipt of funds, especially when it is undisputed that funds would not have been paid to the claimant in the absence of the certification.  Thompson clearly dictates that a certified

26

their compliance with this standard, they submitted a false

claim.[18]

---

statement of statutory or regulatory compliance is material when the <u>certification</u> is a prerequisite to receipt of government funds. <u>Thompson</u>, 125 F.3d at 902. The materiality of the certified statement is not dependent upon how large a role the truth or falsity of the certification plays in the government's ultimate decision whether to remit payment.

[18] The dissent maintains that <u>Thompson</u> is not dispositive in the instant case because the certification requirement at issue here has only a "formalistic connection with the payment decision." The dissent appears to suggest that a certification requirement cannot be a "true" prerequisite to payment unless the truth or falsity of that certification was the actual, "but-for" cause of the government's ultimate determination whether to remit funds on the claim. We find this suggestion problematic for a number of reasons. Initially, we are bound by our precedent in <u>Thompson</u>, which concludes that "false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit" without suggesting any "but-for causation" caveat as advocated by the dissent.

Secondly, this interpretation appears inconsistent with the "outcome materiality" requirement espoused by the dissent. <u>Kungys</u> defines a material misrepresentation as a misrepresentation that "has a natural <u>tendency to influence</u> or was <u>capable of influencing</u> the decision of" the governmental entity to which the statement was addressed. This definition does not suggest that the misrepresentation must have <u>actually influenced</u> the relevant governmental entity to be deemed "material." Indeed, as three members of the Court in <u>Kungys</u> pointed out, a materiality requirement is not the equivalent of a but-for causation requirement:

> We do not agree with petitioner's contention that [the Immigration and Nationality Act's language sanctioning individuals whose naturalization was "procured by" concealment of a "material" fact] requires the Government to establish that naturalization would not have been granted if the misrepresentations or concealments had not occurred. If such a "but for" causation requirement existed in [the "procured by" language] it is most unlikely that a materiality requirement would have been added

27

We recognize, as did the Ninth Circuit in <u>Upton</u>, that not all statutory, regulatory, or contractual violations necessarily give rise to liability under the FCA. However, once a claimant has made a <u>certification of compliance</u> with a statutory or regulatory provision or a provision of a contract mandated by statute or regulation, the claimant is subject to liability under the Act for submitting a false claim if that certification of compliance is known by the claimant to be false.

The Defendants nonetheless contend that their certification could not have constituted a "false claim" because the government had knowledge of the falsity of the certification when it

> as well – requiring, in addition to distortion of a decision, a natural tendency to distort the decision. Moreover, the difficulty of establishing "but for" causality . . . many years after the fact, is so great that we cannot conceive that Congress intended such a burden to be met before a material misrepresentation could be sanctioned.

485 U.S. at 776-77 (opinion of Scalia, J., joined by Rehnquist, C.J., and Brennan, J.). This analysis suggests that "materiality" and "but-for causation" are distinct (and, indeed, inconsistent) requirements.

Finally, as the above passage indicates, there are problems of proof that arise when the government is required to demonstrate that a claimant's misrepresentation actually motivated its decision to approve a claim. Imposing such an evidentiary burden risks excessively constraining the government's ability to sanction claimants who make false representations to the government. As we share Justice Scalia's concerns in this regard, we reject the dissent's suggestion that "but-for causation" is the appropriate test of materiality in the instant case.

28

remitted payment.[19]  While we acknowledge that government

knowledge of the falsity of a claim might, under limited

circumstances, be a defense to an action under the FCA, see infra

Part IV, we find it difficult to comprehend how the government's

awareness that a claimant's submission was false would in any way

[19]  The dissent points to four cases from other circuits that, according to the dissent, "reject[] civil FCA liability where defendant contractors arguably submitted 'false' certifications, but were engaged in cooperative or supervised undertakings with the government that rendered the certifications irrelevant to the ongoing payment decisions."  See infra n.8 and accompanying text.  Of these four cases, only United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013 (7th Cir. 1999), involves a certification of statutory or regulatory compliance akin to the certification requirement at issue in the instant case.  Lamers was a qui tam case where the Seventh Circuit considered a private relator's claim that the City of Green Bay had, on numerous occasions, falsely certified (and falsely represented in informal correspondence) that its transit system complied with federal regulations.  While the court's rejection of the relator's FCA claim was based largely on its determination that it was unclear whether the city's certifications were actually false, the court also took note of the evidence that the City was cooperating with federal authorities in an attempt to bring their transit system into full compliance with federal regulations and reasoned that FCA liability would be inappropriate under these circumstances.  See id. at 1019-20.

Initially, we note that it is unclear from Lamers whether the Seventh Circuit refused to impose liability because the government's knowledge undermined the falsity of the claim or because the Seventh Circuit accepted that government knowledge was a viable defense to FCA liability under the circumstances of that case.  Moreover, as discussed infra at Part IV, the rationale provided by the Seventh Circuit for its refusal to impose FCA liability in Lamers is specific to qui tam cases and is far less compelling in the context of an FCA claim brought by the government.  Accordingly, we are not persuaded that the reasoning of Lamers obligates us to depart from Thompson's clear holding that "false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit."  Thompson, 125 F.3d at 902 (adopting the reasoning of Anton, 91 F.3d at 1266).

affect the truth or falsity of the claim.  A lie does not become the truth simply because the person hearing it knows that it is a lie.

The premise underlying this argument reveals the true nature of the Defendants' position.  In arguing that a claimant's submission is not truly "false" if the government knows it to be untrue, the Defendants are actually arguing that when the government remits payment on a claim knowing that a certification contained therein is false, the government waives its right to pursue a cause of action under the civil FCA.  We find this position untenable for a number of reasons.

Initially, we note that the falsity of a claim is determined at the time of submission.  If a claimant has submitted a claim (i.e., a request or demand for money or property) to the government and the claimant knows that he or she is not actually entitled to the funds or property in question, the claimant has asserted a false claim.  Fortuities in the government's subsequent decisionmaking process have no effect on the objective truth or falsity of the claimant's asserted entitlement, and should thus have no effect on the claimant's potential liability under the Act.  Cf. United States v. Krizek, 111 F.3d 934, 939-40 (D.C. Cir. 1997) (finding that the question of what constitutes a claim under the False Claims Act "turns[] not on how the government chooses to process the claim, but on how many times the defendants made a 'request or demand'" because the "gravamen

30

of these cases is that the focus is on the conduct of the defendant"). This reading of the Act is consistent with this court's analysis of analogous provisions in the criminal False Claims Act and related statutes. See United States v. Milton, 602 F.2d 231, 233 (9th Cir. 1979) (holding, in the context of the criminal False Claims Act, that "[t]o prove Falsity, the government only had to prove that the statement was known to be untrue at the time [the defendant] made it") (emphasis added); see also United States v. Leahy, 82 F.3d 624, 633 n.11 (5th Cir. 1996) (holding that the defendant contractor violated 18 U.S.C. § 286 – a companion statute to the criminal FCA – because his claims were false when submitted, even though the false claims were ultimately irrelevant to the total amount paid by the government to the contractor).

In addition, the Defendants' position is problematic because they are effectively invoking estoppel against the government.[20]

---

[20] The dissent contends that this is a mischaracterization of the Defendants' position. According to the dissent, the Defendants are arguing "not that the government is estoped from holding them liable on [a false claims] theory, but that they are not liable as a matter of law." While this may be true with respect to the Defendants' invocation of government knowledge as a defense, the Defendants' contention that a claim cannot be false if the government was aware of the circumstances rendering it untrue is equivalent to an estoppel argument. As noted above, as a matter of pure logic, the fact that the government is aware that a claimant's submission is false upon receipt of that submission does not make the statement any less false. Accordingly, what the Defendants must be contending is that once the government accepts and remits payment on a claim knowing that claim to be false, the government cannot argue that the claim was false in a court of law.

The Defendants contend that because the government's remission of payment represents that the government entity has evaluated all the relevant information and (presumably) determined that a claim is valid, the government should be estopped from arguing that the claim is invalid in a subsequent judicial proceeding. The premise underlying this argument is contrary to our longstanding presumption that estoppel against the government is impermissible. See, e.g., Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 382, 386 (1947) (holding that a farmer who obtained federal insurance based on improper advice by an agent of the Federal Crop Insurance Corporation that his entire crop qualified for insurance could not recover for the loss of his crop because the government could not be estopped from denying the claim by the agent's erroneous statements); see also Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 419-20 (1990) (recognizing that "equitable estoppel will not lie against the Government as it lies against private litigants" and acknowledging Merrill as "the leading case in [the Court's] modern line of estoppel decisions").[21]

---

[21] The Supreme Court has mentioned the possibility that some type of "affirmative misconduct" by a government official might give rise to estoppel against the government. See, e.g., Richmond, 496 U.S. at 421; see also Linkous v. United States, 142 F.3d 271, 277 (5th Cir. 1998) ("In order to establish estoppel against the government, a party must prove affirmative misconduct by the government in addition to the four traditional elements of the doctrine."). However, the Court has never invoked this exception and there is no suggestion of such "affirmative misconduct" in the instant case.

We decline to depart from this longstanding presumption in the instant case. Initially, we observe that even the traditional, more lenient requirements to invoke estoppel against a private party are not present in this case. The four traditional requirements are: "(1) that the party to be estopped was aware of the facts and (2) intended his act or omission to be acted upon; (3) that the party asserting estoppel did not have knowledge of the facts[] and (4) reasonably relied on the conduct of the other to his injury." Linkous, 142 F.3d at 278 (citing United States v. Bloom, 112 F.3d 200, 205 (5th Cir. 1997)) (alterations in original). The Defendants' estoppel-type argument fails because they cannot satisfy the third requirement. The Defendants had knowledge of the relevant facts (i.e., the condition of the Complex and the falsity of the certification that the Complex was in decent, safe, and sanitary condition). Thus, the traditional requirements for invoking estoppel are not met.

Moreover, even if all four traditional requirements for private-party estoppel were satisfied, estoppel against the government would still be inappropriate under the circumstances of this case. The Court in Richmond expressly held that "judicial use of the equitable doctrine of estoppel cannot grant [a claimant] a money remedy that Congress has not authorized." 496 U.S. at 426-27 (noting further that "not a single case has upheld an estoppel claim against the Government for the payment

33

of money").  The Court's asserted rationale for this holding was to prevent fraud against the government via collusion between government officials and private claimants and, more generally, to ensure that public funds are spent "according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants."  Id. at 428.  We find this logic to be equally applicable in situations like the present case, where the Government seeks to recover funds spent contrary to the will of Congress, as in situations like Richmond, where the government sought to prevent payment of a claim that would have been paid in derogation of the will of Congress.  Cf. United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1422 (9th Cir. 1991) (noting in dicta that a defendant's "'inability to retain money that it should never have received in the first place' is not the kind of detrimental reliance that justifies estoppel against the government") (quoting Heckler v. Cmty. Health Servs., 467 U.S. 51, 61 (1984)).  While we acknowledge that the treble damage provision of the civil FCA produces a harsher result than mere recovery of the expended funds, we note that these damages and other remedies are authorized by Congress.  In addition, the fact that the unavailability of estoppel permits the government to recover treble damages does not justify departure from the longstanding and widely-accepted principle disfavoring government estoppel.

34

See Merrill, 332 U.S. at 386 (recognizing that "not even the temptations of a hard case" will provide a basis for ordering recovery of funds that would be expended contrary to law).[22]

Finally, from a practical perspective, we note that acceptance of the Defendants' position in this litigation would place HUD in an extremely difficult position. The argument that payment by the government of a false claim with knowledge of its falsity forecloses any future false claims action assumes that, upon receiving a HAP voucher for a property that is not decent, safe, and sanitary, HUD must either immediately cease HAP payments (which, in most cases, would effectively put the claimant out of business and the tenants on the street) or forfeit the right to pursue a false claims action against the claimant in the future. Put differently, if HUD elects to work with the claimant to improve the condition of the property rather than to cut off payments immediately, HUD waives the government's right to pursue a cause of action under the FCA. Such an "election of remedies" requirement is not contemplated by the

---

[22] We note that the instant case is not a particularly "hard case" from an equitable perspective. The Defendants were well aware of their contractual and regulatory obligation to maintain the Complex in decent, safe, and sanitary condition. Similarly, at the time that they signed the HAP contract, the Defendants were aware that they would be obliged to make a monthly certification of their compliance with the "decent, safe, and sanitary" standard, and that a false certification of compliance with this standard would subject them to treble damages under the civil FCA or prosecution under the criminal FCA.

35

statutory, regulatory, or contractual regime governing this Section 8 program.  The Government's rights under the regulatory contract and under the False Claims Act are not mutually exclusive.

The Defendants suggest that if there is no de facto "election of remedies" requirement, the Government can use the threat of FCA liability "as an in terrorem device . . . to force the Partners and other owners . . . to invest their own money to make up the shortfall in funds for maintenance."  Relying on Christopher Village, the Defendants argue that an owner is not required "to absorb or subsidize operating and maintenance deficiencies" if HUD has not established rental rates adequate to cover a property's expenses.  190 F.3d at 316.  However, the question of whether HUD properly considered the Defendants' requests for rent increases is not presented in this case.  Our task is to determine whether HUD's choice to continue remitting HAP payments to an owner whose property is not in decent, safe, and sanitary condition precludes the government from pursuing a false claims action based on the owner's false certification that the property was, in fact, decent, safe, and sanitary.  We find no basis for such a preclusion.  To the extent that the multiple remedial paths available to the government under this regulatory and contractual regime have the effect of pressuring owners to take steps (such as investing in preventive maintenance or retaining what is likely to be an adequate reserve during the

early years of a project) to ensure they can provide decent, safe, and sanitary housing throughout the duration of a project's existence, such an incentive structure is clearly contemplated by the statutory and regulatory regime governing the Section 8 program and by the contract that the Defendants willingly signed.

It is clear that the position taken by both the Defendants and the dissent is motivated by an underlying concern that the Government has somehow treated the Defendants "unfairly" by pursuing an action under the FCA after HUD initially chose to work with the Defendants cooperatively to remedy the problems at the Complex. We cannot similarly conclude that the Defendants have been ill-used. As noted above, the fact that HUD, upon discovering maintenance and safety problems at the Complex, chose to provide the Defendants with an opportunity to cure the defects rather than immediately cutting off the Defendants' HAP payments in no way implicates the Government's ability to maintain a cause of action under the FCA. Further, even if it would be problematic for the Government to pursue a civil FCA action against an owner for false claims made while the owner was making a good faith attempt to work with HUD and remedy the problems at a project, this was not the situation in the instant case. The Government did not initiate any action under the FCA until well after the informal cooperative process had broken down and the Defendants had, in fact, indicated their intent to abandon the project entirely. Moreover, we emphasize that the Government has

37

not attempted to hold the Defendants liable for false claims made while the Defendants were participating in good faith in the cooperative remedial process. The instant action is based only on claims made during the time period <u>after</u> the Defendants effectively ceased cooperating with the requirements of HUD's informal remedial process. Under these circumstances, we cannot conclude that the government has acted deceptively in pursuing its contractual remedies by initiating a false claims action.

In light of the above analysis, we conclude that the district court erred in granting summary judgment to the Defendants on the ground that they did not, as a matter of law, submit a "false claim." Maintaining a property in decent, safe, and sanitary condition is a prerequisite to the Defendants' entitlement to HUD funds in the instant case. Accordingly, a false certification of compliance with the decent, safe, and sanitary standard is material and renders the claim false as a matter of law.

Because there is a genuine issue of material fact regarding whether the submission was indeed false (i.e., whether the property was actually in decent, safe, and sanitary condition during the time period in question), we cannot hold as a matter of law that the Defendants submitted a false claim. However, in the same vein, the substantial evidence in the record indicating that the property was unsafe and unsanitary during the time

38

period in question — suggesting that the claim was indeed false — certainly precludes summary judgment in favor of the Defendants on these grounds.

## IV. DID THE DEFENDANTS "KNOWINGLY" SUBMIT A FALSE CLAIM?

We turn now to the mens rea element of a cause of action under the Act, i.e., the requirement that a defendant must "knowingly" submit false or fraudulent claims, or false or fraudulent statements in support of those claims, to the government. See 31 U.S.C. § 3729(a)(1) & (a)(2) (Supp. 2001). The Defendants maintain that a claimant cannot have the requisite mens rea to be held liable under the Act if the claimant knows that the government is aware of the falsity of the information submitted. The district court agreed, concluding that "[b]ased on the undisputed evidence, and specifically the record of HUD's knowledge . . . together with the proof of communications between HUD and defendants concerning the problems at the apartments, there could be no reasonable finding that defendants acted knowingly." Southland Mgmt. Corp., 95 F. Supp. 2d at 641 (emphasis omitted).

We disagree with the district court's conclusion. While we agree that, in certain situations, evidence that the defendant knew that the government was aware of the falsity of a claim when it was submitted may be relevant in determining whether the defendant knowingly submitted a false claim, we hold that such knowledge on the part of the defendant is not an automatic

39

defense to liability.  We further conclude that the district court erred in finding, as a matter of law, that HUD's knowledge of the condition of the Complex negated the Defendants' mens rea in this case.

The mens rea required for a person to be held liable under the civil False Claims Act has always been the submission of a claim "knowing" it to be false.  See 31 U.S.C. § 3729(1) (1983).  Under the Act, a person acts "knowingly" if he or she "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required."  Id. § 3729(b).  The text of the Act as it appears today (i.e., subsequent to the 1986 amendments) contains no indication that government knowledge of the falsity of a submission might bear on the defendant's mens rea.  Moreover, there is nothing in the legislative or statutory history of the Act suggesting that Congress intended to preclude the government from pursuing an action under the civil FCA when the government was aware of the facts and circumstances rendering a claim false at the time of submission.[23]  The Defendants nonetheless contend that such

---

[23]  Prior to the 1982 Amendments, the text of the Act did indicate that private plaintiffs could not pursue qui tam actions under the Act if the government was aware of the information forming the basis of the complaint.  See 31 U.S.C. § 232(C) (1976).  While the early versions of this provision (i.e., prior to the 1982 recodification) did not indicate whether it applied

40

government knowledge is an absolute bar to liability under the Act.

We find it difficult to justify the proposition that an individual who submits a false claim to the government with knowledge of its falsity should necessarily be excused from liability under the Act merely because the government was also aware that the claim was false when it was submitted. Several of our sister circuits have recognized that, while evidence that the government was aware of the facts and circumstances rendering a claim false at the time of submission may be relevant to a defendant's state of mind in submitting a false claim, such knowledge does not provide an automatic bar to suit. See, e.g., United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1156-57 (2d Cir. 1993); Hagood, 929 F.2d at 1421. These courts explain that, while government knowledge may, in some circumstances, provide evidence that a defendant did not submit a claim with actual knowledge of its falsity or in deliberate ignorance or reckless disregard for

---

to actions brought by the government, the provision was contained within a section of the statute specifically addressing the procedural requirements for qui tam actions. See generally 31 U.S.C. § 232 (1976) (entitled "Procedure for private claims"). This jurisdictional bar was subsequently eliminated in the 1986 amendments. For the purposes of the instant case, we note that this prohibition was never applicable to actions initiated by the government. See 31 U.S.C. § 3730(b)(4) (1982) ("Unless the Government proceeds with the action, the court shall dismiss an action brought by the person on discovering the action is based on information the Government had when the action was brought.") (emphasis added).

41

the truth, see Kreindler & Kreindler, 985 F.2d at 1156; Hagood, 929 F.2d at 1421, a defendant alleged to have violated the civil False Claims Act "is not automatically exonerated by any overlapping knowledge by government officials," Kreindler & Kreindler, 985 F.2d at 1156.

We agree with the Kreindler and Hagood courts that a defendant's knowledge that the government is aware of the falsity of a claim can, under certain circumstances, be relevant to mens rea. However, in the context of a claim brought by the government (as opposed to a qui tam action), the circumstances in which such knowledge is relevant are quite limited. In the context of government-initiated FCA actions, we would permit a "government knowledge defense" primarily in the rare situation where the falsity of a claim is unclear and the evidence suggests that the defendant actually believed his claim was not false because the government approved and paid the claim with full knowledge of the relevant facts.

In contending that a "government knowledge" defense should apply in the instant case, the Defendants rely on qui tam cases such as Lamers and Wang v. FMC Corp., 975 F.2d 1412 (9th Cir. 1992). The courts in these qui tam cases have acknowledged that there are potential problems with allowing private relators to bring qui tam actions while the government is in the process of trying to work informally with a defendant to achieve compliance with particular statutory or regulatory provisions. See, e.g.,

42

Lamers, 168 F.3d at 1020 ("Lamers, it seems, wants to use the FCA to preempt the FTA's discretionary decision not to pursue regulatory penalties against the City."). While these might be valid concerns in the qui tam context, we find these potential problems far less compelling in the context of an FCA action brought by the federal government, particularly when the action is brought after any informal negotiation process has proved unsuccessful, as in the instant case. Thus, the qui tam cases cited by the Defendants and the dissent do not provide a compelling reason why the Defendants should be excused from liability based on a "government knowledge defense" under the circumstances of this case.[24]

With these principles in mind, we now turn to the question whether the district court properly granted summary judgment in favor of the Defendants on the mens rea issue. As noted, the district court held that because of HUD's knowledge and the

---

[24] We emphasize that we need not, and do not, address today the availability of a "government knowledge" defense in qui tam actions. Qui tam actions are governed by substantively different rules than government-initiated FCA actions in many respects. Government knowledge of the facts and circumstances underlying a claim has historically played a different role in qui tam actions than in FCA actions brought by the government. See supra note 23. Indeed, under certain circumstances relators are still jurisdictionally barred from bringing qui tam actions under the FCA if the government had knowledge of the facts and circumstances that form the basis of the relator's claim. See 31 U.S.C. § 3730(e). In light of these distinctions, it is appropriate for this court in the instant case to confine our discussion of the availability of a "government knowledge defense" to government-initiated FCA actions.

43

communications between the parties, "there could be no reasonable finding that defendants acted knowingly." Southland Mgmt. Corp., 95 F. Supp. 2d at 641. Although the record makes clear that HUD had a fair amount of information regarding the condition of the Complex, the record also indicates that the Defendants, as the ones who monitored the property and entered the units, had actual knowledge that the Complex was not in decent, safe, and sanitary condition. Moreover, there is evidence in the record suggesting that it was clear to the Defendants that the certifications in their HAP vouchers were false.

After our review of the record, we conclude that a factfinder could determine on this record that the Defendants knowingly submitted false claims to the government. Thus, there is a genuine issue of material fact regarding the Defendants' knowledge, and the district court erred in granting summary judgment in favor of the Defendants on this issue.

## V. Is the Phrase "Decent, Safe, and Sanitary" Sufficiently Concrete to Support a Finding of Liability Under the Act?

The Defendants contend that an allegedly false certification that a property is in "decent, safe, and sanitary" condition cannot provide the basis for civil False Claims Act liability. Noting that the phrase "decent, safe, and sanitary" is not defined in the HAP contract, they argue that any evaluation of a property pursuant to this standard is inherently subjective. According to the Defendants, because a jury cannot determine

44

whether a certification of compliance with the "decent, safe, and sanitary" standard is objectively "true" or "false," such a certification cannot support a false claims action under the FCA.

The Government responds that the "decent, safe, and sanitary" standard is meaningful and susceptible to objective analysis. The Government points to the 1995 version of 24 C.F.R. § 881.201 stating that "[h]ousing continues to be decent, safe and sanitary if it is maintained in a condition substantially the same as at the time of acceptance," 24 C.F.R. § 881.201 (1995), arguing that this language gives the standard substance.[25] Moreover, the Government claims that the published Housing Quality Standards ("HQS") that HUD inspectors employ during annual physical inspections also clarify the correct interpretation of the phrase.

The district court did not rule on this issue, but did suggest that the Defendants' position had "arguable merit." See Southland Mgmt. Corp., 95 F. Supp. 2d at 635 n.7. The court correctly noted that, during the time period in question, the Housing Quality Standards on which the Government relies were not expressly referenced in the regulations governing the Substantial Rehabilitation Section 8 Program, and no other HUD regulations

---

[25] The Defendants contend that this regulatory guidance is insufficient to give meaning to the phrase "decent, safe, and sanitary" because there is no implication that housing is decent, safe, and sanitary only if it is maintained in this manner. We agree that this language suggests an affirmative defense rather than an exclusive definition of "decent, safe and sanitary."

45

then applicable to the Substantial Rehabilitation Program defined the phrase "decent, safe, and sanitary." While the district court indicated that the standard appeared to be subjective, the court also recognized that "there are cases in which property would not qualify as 'decent, safe and sanitary' under any conceivable definition of those terms." Id. at 635 n.7.

As this issue was not the basis of the district court's summary judgment in favor of the Defendants, we assume that the Defendants raise this argument on appeal in order to invite this court to affirm the district court's judgment on these alternate grounds.[26] We decline this invitation.

The question presented by the Defendants is one of first impression for this court: Whether a certification that a property is in "decent, safe, and sanitary" condition is sufficiently concrete that a jury could determine if the certification is true or false? While the normal procedure where the lower court has not considered a pertinent issue is to remand the case, considerations of judicial economy can dictate otherwise in circumstances such as these, where the issue is a purely legal question subject to plenary review by this court.

---

[26] We note that we have the ability to affirm on these alternate grounds. See Manning v. Warden, La. State Penitentiary, 786 F.2d 710, 711 (5th Cir. 1986) (affirming on other grounds); see also Bickford v. Int'l Speedway Corp., 654 F.2d 1028, 1031 (5th Cir. 1981) (stating that "reversal is inappropriate if the ruling of the district court can be affirmed on any grounds").

See <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 530 (1985); <u>see also</u>

<u>Hudson United Bank v. LiTenda Mortgage Corp.</u>, 142 F.3d 151, 159

(3d Cir. 1998). Accordingly, we can appropriately reach this

question despite the fact that the district court's summary

judgment was not based on this issue.

In contending that the phrase "decent, safe, and sanitary"

is too subjective to support FCA liability, the Defendants rely

on a number of cases holding that this phrase is too indefinite

to create any legally cognizable rights for the tenants of

programs funded under the housing statutes. <u>See, e.g.</u>, <u>Perry v.

Hous. Auth. of Charleston</u>, 664 F.2d 1210, 1217 (4th Cir. 1981).

This court has recently indicated support for this proposition as

well. <u>See</u> <u>Banks v. Dallas Hous. Auth.</u>, 271 F.3d 605, 610 (5th

Cir. 2001). However, these decisions are inapposite. As the

Government correctly points out, none of these cases is an FCA

case, and the question whether language is too indefinite to

create a legally cognizable statutory right is entirely separate

from whether that language can form the basis of a "false claim"

action under the FCA.[27]

We find that the phrase "decent, safe, and sanitary," as

applied in the context of assessing housing conditions, has a

_____

[27] One particularly relevant distinguishing feature between these two inquiries is that while courts do not consider regulatory guidance in determining whether statutory language creates a legally cognizable right, <u>see</u> <u>Banks</u>, 271 F.3d at 610 n.4, it is appropriate to consider regulatory clarification in the instant case.

commonsense "core of meaning" such that it is capable, without additional definition, of being understood by a factfinder called upon to evaluate whether a certification of compliance with this standard is objectively true or false. Certainly, different members of the general public might provide different specific definitions of this term or might emphasize different factors in assessing whether housing is "decent, safe, and sanitary." However, the fact that each individual's exact definition of the meaning of this phrase might differ does not undermine the proposition that the general meaning of the concept is commonly understood. As we have noted in another, quite different context, despite the fact that certain words or phrases might "strike distinct chords in individual jurors," they can nevertheless have a "plain meaning of sufficient content that the discretion left to the jury" is "no more than that inherent in the jury system itself." Milton v. Procunier, 744 F.2d 1091, 1096 (5th Cir. 1984) (holding that the Texas capital sentencing scheme is permissibly applied when the sentencing jury evaluates the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society" without any specific definitions); see also James v. Collins, 987 F.2d 1116, 1120 (5th Cir. 1993) (same). We find that the phrase "decent, safe, and sanitary" has a widely accepted ordinary meaning in the context of housing quality assessments that enables a jury to evaluate whether a property meets this standard, even if the

48

applicable regulations provide no further elaboration on the meaning of the term.

Our conclusion that the concept of "decent, safe, and sanitary" housing has a commonly-understood ordinary meaning is bolstered by the history of the parties' interactions pursuant to the HAP contract. Initially, we note that the HAP contract signed by the Defendants contains a covenant requiring the owner to agree to maintain the facilities "so as to provide Decent, Safe, and Sanitary housing." The Defendants willingly agreed to this covenant without indicating any uncertainty about the meaning of the standard. Similarly, more than one hundred times during the course of the project's history, the Defendants certified under penalty of fine or imprisonment that the Complex was in decent, safe, and sanitary condition. The record contains no indication that the Defendants even once inquired as to the meaning of this term prior to signing these certifications. The Defendants' repeated certifications in the HAP vouchers, combined with the complete lack of prior dispute about the meaning of the standard, provide strong indication that the Defendants and HUD had a mutual, common understanding of the meaning of the phrase "decent, safe and sanitary."

It is also significant that the "decent, safe, and sanitary" language has been part of the statutory scheme governing public housing since the inception of the current federal housing program in the 1930s. During the almost seventy years since the

49

program's enactment, there are <u>no</u> reported cases challenging this terminology on the ground that it provides inadequate notice of the standard governing public housing conditions.[28]  This notable lack of legal debate further supports our conclusion that the concept of "decent, safe, and sanitary" housing has a sufficiently concrete, commonsense meaning that is neither inherently subjective nor impermissibly vague.  A factfinder in a civil action is perfectly capable of applying this standard and determining whether a certification that housing is in "decent, safe, and sanitary" condition has been falsely made.

The Defendants also appear to argue that, even if the phrase "decent, safe, and sanitary" has an objective and ascertainable meaning, they still cannot be held liable for a false claim based on this provision.  They point to a number of decisions from other circuits suggesting that errors attributable to differences in the interpretation of disputed legal questions cannot form the basis of a false claims action under the FCA.  <u>See, e.g.</u>, <u>Lamers</u>, 168 F.3d at 1018; <u>Hagood</u>, 81 F.3d at 1478-79.  Relying on these authorities, the Defendants suggest that they cannot be held

_____

[28]  Indeed, there are cases that successfully apply this standard to determine whether owners are in compliance with their contractual obligations regarding the condition of housing projects.  These cases do not elaborate on the meaning of the phrase "decent, safe, and sanitary" or suggest in any way that the standard lacks a concrete meaning.  <u>See, e.g.</u>, <u>Marshall v. Cuomo</u>, 192 F.3d 473, 479-80 (4th Cir. 1999) (determining that a corporation was appropriately debarred from further participation in Section 8 programs because its properties were not maintained in "decent, safe, and sanitary" condition).

50

liable under the Act if their submission was grounded in a legitimate dispute about the correct legal interpretation of the phrase "decent, safe, and sanitary."

The Defendants' briefs do not indicate the exact nature of their disagreement about the meaning of the standard. However, in the portions of their testimony contained in the record, two of the Defendants offer alternate definitions of the phrase "decent, safe, and sanitary" that would purportedly render their certifications correct. Defendant Doty initially grants in his testimony that the term "decent, safe, and sanitary" should be evaluated based on common and ordinary understanding of the terms. Doty then suggests that under this common understanding, the term "decent, safe, and sanitary" housing refers to housing that "where you walk in, you wouldn't fall in through the floor." Defendant McLaurin similarly suggests that "decent, safe, and sanitary" housing is housing that "[keeps] the weather out" and "[does not] have things falling on you."

Even if this testimony does indicate that the Defendants were operating pursuant to a bona fide dispute about the meaning of the "decent, safe, and sanitary" standard, we note that the Defendants can still be held liable under the FCA for submitting false claims if their interpretation of the disputed regulatory or contractual language was unreasonable. A number of courts have recognized that, while a legitimate dispute regarding the meaning of a regulatory or statutory provision might preclude FCA

51

liability, the government can nonetheless prove the falsity of a claim by establishing the unreasonableness of the defendant's interpretation of the regulation or contractual provision. <u>See, e.g.</u>, <u>Commercial Contractors, Inc. v. United States</u>, 154 F.3d 1357 (Fed. Cir. 1998); <u>United States v. Krizek</u>, 859 F. Supp. 5, 11-12 (D.D.C. 1994), <u>aff'd</u>, 111 F.3d 934 (D.C. Cir. 1997).

This issue was not addressed by the district court and is not sufficiently developed in this record or in the briefs for us to express any view upon it other than to set out the applicable law. We leave it to the district court on remand.

In sum, we decline to uphold the district court's summary judgment on the alternate grounds suggested by the Defendants.

### VI. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of the Defendants is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. Costs shall be borne by the Defendants.

EDITH H. JONES, dissenting:

This is a complex case legally but not factually. The legal difficulties, and my disagreements with the panel majority, will be stated shortly. Factually, the case concerns the government's effort to inflict severe penalties on HUD-subsidized low-income apartment owners because there were (1) roaches (in the deep South, no less), (2) broken doors and windows (caused partly by tenants), and (3) crime (in a high-crime, crack-dealing neighborhood). HUD knew of this property's problems for years before it foreclosed, but HUD's policy, confirmed by the evidence in this case, was to work with the owners to seek remedies gradually. There is no evidence of concealment or wrongdoing by the property owners. The property owners never collected a dime in profit after fiscal year 1993 and spent all of their HUD subsidies trying to keep up with the maintenance and mortgage payments. In short, HUD was complicit in any mismanagement that allowed the property to deteriorate.

According to the majority opinion, however, the owners may be liable under the False Claims Act despite the vagueness of the contractual standard and the government's ongoing knowledge of the condition of the apartments. Moreover, the majority hold that a false claim exists as a matter of law if the defendants'

53

certifications of compliance with the regulatory standard were false – irrespective of the government's knowledge of noncompliance and its failure to rely on the certifications. Given the facts of this case, the majority's conclusion constitute a significant and unnecessary extension of the FCA. The statute was originally passed to prevent "all types of fraud" against the United States government that might result in financial loss. United States v. Neifert-White Co., 390 U.S. 228, 232, 88 S.Ct. 959, 961 (1968). But "[s]ince the Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay." United States ex rel. Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001).

By imposing materiality as a matter of law based solely on a formalistic certification, and by constricting the defense of government knowledge of the contractor's actions, the majority threatens to transform the FCA into a weapon against mere breaches of contract. The majority of courts recognize, however, that

> . . . the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them.

54

United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1019 (7th Cir. 1999).  The costs of government contracts are already inflated by complex rules unknown to private business transactions.  This opinion will generate additional costly premiums to offset the increased risk posed by its expansion of FCA liability.  Indeed, the fear of having to defend an FCA claim for non-material misstatements or problems known by the government will discourage many businesses from bidding for government contracts.

I respectfully dissent.

**I.   The payment vouchers were not material to HUD's decision making.**

The majority hold that when certification of statutory or regulatory compliance is an express prerequisite to receiving a benefit from the government, a false certification is material and renders the claim false as a matter or law.  I disagree with this excessively broad conclusion and with the majority's dalliance, *in dicta*, with an "outcome materiality"/"claim materiality" dichotomy advocated by the government.  I would hold that no genuine issue of fact exists concerning the materiality of these defendants' monthly certifications to HAP that the apartments were decent, safe and sanitary.

No ambiguity exists in this court's recent reaffirmation that the civil FCA "interdicts material

55

misrepresentations made to qualify for government privileges or services." <u>United States ex. rel. Thompson v. Columbia/HCA Health Care Corp.</u>, 125 F.3d 899, 902 (5th Cir. 1997) (quoting <u>United States ex. rel. Weinberger v. Equifax, Inc.</u>, 557 F.2d 456, 461 (5th Cir. 1977)). <u>Weinberger</u>'s 25-year-old requirement of materiality is just as straightforward as is <u>Thompson</u>'s holding.[29] Moreover, other circuits have continued to state that materiality is required in a civil FCA claim. <u>See</u>, <u>e.g.</u>, <u>Luckey v. Baxter Health Care Corp.</u>, 183 F.3d 730, 732 (7th Cir. 1999); <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 785, 788 (4th Cir. 1999). A recent district court decision, after conducting the most extensive survey to date of the history, legislative background and caselaw interpreting the FCA, concluded that materiality remains an element of a civil FCA claim. <u>See</u> <u>United States ex rel. Wilkins v. North Am. Const. Corp.</u>, 173 F.Supp.2d 601, 618-30 (S.D. Tex. 2001).[30]

---

[29]    This court said in <u>Weinberger</u> that to prove liability -- that is, "to establish that Equifax committed <u>fraud</u> in this manner," 557 F.2d at 461 (emphasis added) -- "Weinberger <u>first</u> must demonstrate that the government <u>was misled</u> by Equifax's application for the reporting business." <u>Id.</u> (emphasis added).

[30]    The only circuit court language contrary to a materiality rule exists in the Third Circuit's passing observation that "perhaps <u>Neder</u> argues against a materiality requirement." <u>United States ex. rel. Cantekin v. University of Pittsburgh</u>, 192 F.3d 402, 415 (3d Cir. 1999), <u>cert</u>. <u>denied</u>, 121 S.Ct. 192 (2000).

    In two cases, the Supreme Court, ruling on whether materiality was an element under certain federal criminal false statement statutes, discussed the concept of materiality in ways that may ultimately be held relevant to the civil FCA. <u>See</u> <u>Neder v. United States</u>, 527 U.S. 1, 20-25, 119 S.Ct. 1827, 1839-41 (1999); <u>United States v. Wells</u>, 519 U.S. 482, 489-99, 117 S.Ct. 921,

According to the majority opinion, however, the precise definition of materiality remains open to question in this court based on a government theory never before accepted by a federal court.[31] The majority's mischievous dicta demand a brief response. The majority suggest that "materiality" has two plausible meanings. The accepted definition at common law and in false statement statutes similar to the civil FCA equates materiality with "ha[ving] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed." United States v. Wells, 519 U.S. 482, 489, 117 S.Ct. 921, 926 (1997) (brackets in original) (internal quotation marks omitted) (quoting Kungys v. United States, 485 U.S. 759, 770, 108 S.Ct. 1537, 1546 (1988)). The district court relied on this definition, which the government and the majority dub "outcome materiality." This understanding of materiality is implicit in Thompson and explicit in Weinberger. The government and the majority discern another FCA-specific phenomenon known as "claim materiality," whereby a

926-931 (1997). A footnote in Neder is particularly provocative on this score. 527 U.S. at 24 n.7, 119 S.Ct. at 1840 n.7. Further, federal case law under the criminal FCA holds that there is no materiality requirement for a violation. See, e.g., United States v. Upton, 91 F.3d 677, 685 (5th Cir. 1996). Until the Supreme Court instructs otherwise, however, materiality remains an element of civil FCA claims.

[31] In my view, Wilkins, supra, is misinterpreted by the majority, and no other court authority exists for the "claim materiality" theory. While Wilkins's historical discussion of the materiality requirement is exhaustive, the opinion nowhere mentions, much less adopts, a "claim materiality" standard. And as a district court opinion, Wilkins does not bind this court.

57

falsehood that "bears upon" the claimant's entitlement to receive money or property is material – irrespective of the statement's capability of influencing, or actual influence on, the government's decision.  The government's briefing, like the majority opinion, offers no legislative history, logic, caselaw or grammatical argument in support of "claim materiality."  The government's definition waters down materiality to a subjective or self-fulfilling concept: a representation becomes "claim material" if the government says so, since the government defines the representations made when filing a claim.  No showing of government reliance or that the false statement had the capability of influencing the government's decision is necessary.

The government's advocacy of claim materiality flies in the face of the Supreme Court's seminal case on the definition of materiality.  In Kungys, the Court imported into a statute revoking citizenship the definition of materiality, quoted above, that had been uniformly adopted by lower federal courts in criminal false statement prosecutions.  Kungys, 485 U.S. at 769-70, 108 S.Ct. at 1546.  As to revocations of citizenship, the Court noted that

> Neither the evident objective sought to be achieved by
> the materiality requirement, nor the gravity of the
> consequences that follow from its being met, is so
> different as to justify adoption of a different
> standard.  "Where Congress uses terms that have
> accumulated settled meaning under either equity or the
> common law, a court must infer, unless the statute

58

> otherwise dictates, that Congress means to incorporate
> the established meaning of these terms."

Kungys, id. (citations omitted).  Later, the Court restates the

materiality test as asking "whether the misrepresentation or

concealment was predictably capable of affecting, i.e., had a

natural tendency to affect, the official decision [to grant

citizenship]."  Kungys, 485 U.S. at 773, 108 S.Ct. at 1547.  In

sum, the government's proffered test of "claim materiality" is

ingenious but wrong.  There is even less reason for courts to

adopt a variant standard of materiality in the context of the

punitive civil FCA[32] than there might have been in regard to

immigration violations.  Fortunately, the majority's discussion,

as dicta, cannot detract from the force of our prior cases.

After toying with the concept of claim materiality, the

majority conclude that the owners' signed certifications on the

HAP vouchers were material as a matter of law.  In other words,

when the appellees certified the Jackson Square apartments as,

*inter alia*, decent, safe and sanitary each month on their voucher

for HUD reimbursement, their certifications, if false, constitute

false claims because the certifications are prerequisites to

payment under the pertinent Section 8 program.  See Thompson, 125

---

[32]    Civil FCA actions for treble damages and penalties are "punitive."
Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765,
784-85 (2000); United States ex rel. Garibaldi v. Orleans Parish School Board,
244 F.3d 486, 491 & n.5 (5th Cir. 2001).

F.3d at 902.  I find this conclusion insupportable on several counts.

First, even the government acknowledges that "if there is a traditional 'materiality' requirement, the district court erred in granting summary judgment on this point."  Traditional materiality is a mixed question of law and fact.  The government grudgingly understands, if the majority does not, that the facts must be considered.

Second, I am troubled by the superficiality of equating false certifications with materiality as a matter of law.  In Thompson, this court stated that to create liability under the FCA, a false certification of compliance must be a "prerequisite" to obtaining a government benefit.[33]  Unlike the majority, I

---

[33]    In Thompson, the district court dismissed the plaintiff relator's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  125 F.3d at 900.  This court reversed as to some but not all of the plaintiff's allegations.  Id. at 904.  After concluding that a claimant submits a false claim under the FCA by falsely certifying compliance with a statute or regulation when the Government has conditioned payment of a claim upon such a certification of compliance, id. at 902, this court applied this standard to the allegations at issue in the case before it:

> Thompson alleged that, as a condition of their participation in the Medicare program, defendants were required to certify in annual cost reports that the services identified therein were provided in compliance with the laws and regulations regarding the provision of healthcare services.  He further alleged that defendants falsely certified that the services identified in their annual cost reports were provided in compliance with such laws and regulations.  Thus, Thompson fairly alleged that the government's payment of Medicare claims is conditioned upon certification of compliance with the laws and regulations regarding the provision of healthcare services . . . , and that defendants submitted false claims by falsely certifying that the services identified in their annual cost reports were rendered in compliance with such laws and regulations.

Id.  Instead of simply holding that the defendants' Rule 12(b)(6) motion

60

interpret this language as requiring more than a formalistic connection to the payment decision.[34] I would agree that in many instances, certifications required by the government along with payment vouchers should be presumed to be material to the government's decision to pay a contractor. But what if the facts show that the certifications were not actually a "prerequisite" to the payment and had no tendency to influence the decisionmaker? None of the previous cases that analyzed the connection between FCA civil liability and false certifications involved facts like those before us.[35] On the other hand, courts in several cases have rejected civil FCA liability where

should have been denied, this court then noted that the parties disputed whether "the certifications of compliance contained in annual cost reports are . . . a prerequisite to payment of Medicare claims." Id. The defendants in Thompson argued that the certifications were not a prerequisite to payment because "Medicare claims are submitted for payment shortly after services have been rendered and well before annual cost reports are filed." Id. The plaintiff argued "that such certifications are indeed a prerequisite to payment because the retention of any payment received prior to the submission of an annual cost report is conditioned on the certification of compliance contained therein." Id. Because this court was "unable to determine from the record before us whether, or to what extent, payment for services identified in defendants' annual cost reports was conditioned on defendants' certifications of compliance," this court elected to "deny defendants' 12(b)(6) motions as they relate to this issue and remand to the district court for further factual development . . . [to] determine whether the government's payment of defendants' Medicare claims was conditioned on defendants' certifications of compliance in their annual cost reports." Id. at 902-03 (emphasis added). If the mere certifications had sufficed to establish liability, this remand would have been unnecessary.

[34] The Ninth Circuit requires a causal link between the false certification and the agency's decision to pay. United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996).

[35] See, e.g., United States ex rel. Siewick v. Jamieson Sci. and Eng'g, 214 F.3d 1372 (D.C. Cir. 2000); United States ex rel. Mikes v. Straus, 274 F.3d 687 (2d Cir. 2001); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (4th Cir. 1999); United States ex rel. Hopper v. Anton, 91 F.3d 1261 (9th Cir. 1996).

61

defendant contractors arguably submitted "false" certifications but were engaged in cooperative or supervised undertakings with the government that rendered the certifications irrelevant to ongoing payment decisions.[36]  Similarly, Kungys rejected the lower court's attempt to formulate a distinct standard of materiality for immigration cases, in part because "the judgment in question does not lend itself to mechanical resolution."  485 U.S. at 771, 108 S.Ct. at 1546.  There are probably thousands, if not tens of thousands, of government certification requirements in connection with payment and reimbursement vouchers of every sort.  We paint with entirely too broad a brush to generalize that

> . . . once a claimant has made a certification of compliance with a statutory or regulatory provision or a provision of a contract mandated by statute or regulation, the claimant is subject to liability under the Act for submitting a false claim if that *certification of compliance* is known by the claimant to be false.

Majority Opinion at 2607.  (emphasis in original)  Even more disturbing, the majority's rule seems to jeopardize its recognition that "not all statutory, regulatory or contractual

---

[36]  See United States ex rel. Durcholz v. F.K.W., Inc., 189 F.3d 542, 545 (7th Cir. 1999); Wang ex rel. United States v. FMC Corp., 975 F.2d 1412 (9th Cir. 1992); United States ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321 (9th Cir. 1995); United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013 (7th Cir. 1999).

violations necessarily give rise to FCA liability."[37]  The government need only incorporate boiler-plate "certifications of compliance" with "all" statutes and regulations to put in play punitive FCA sanctions for most government contractors or beneficiaries.

Third, based on the facts well articulated by the district court, I agree with its conclusion that the appellees' certifications of compliance with the decent, safe and sanitary standard on their monthly HUD vouchers were in no way a "prerequisite" to receiving reimbursement and did not in fact influence the agency's decision to pay.  The majority has wisely refused to rely on the only factual evidence supporting the government's materiality position, the deposition of Quentin Lewis.  Lewis, a HUD employee responsible for reviewing and approving the defendants' and hundreds of other payment vouchers, testified only that he would not have approved the vouchers if the certifications had not been <u>signed</u> by the defendants or their agent.  Lewis also testified that he had not read the certification in any depth and had never heard of the phrase

---

[37]    The majority emphasizes the uncompromising nature of its rule by adding in a footnote, "The materiality of the certified statement is not dependent upon how large a role the truth or falsity of the certification plays in the government's ultimate decision whether to remit payment." Majority Opinion at ___, n.18.  Suppose a government contractor mis-certified his payment address for reasons having nothing to do with the contract.  He could be subjected to FCA liability  under the majority's theory.  The majority's reasoning has done away with materiality, at least in certification cases, while purporting to apply it!

63

"decent, safe and sanitary" until the date of his deposition.  As the district court observed, "there is nothing in the record to show that Lewis, <u>or anyone else with HUD</u>, took into account the actual substance of the certifications in deciding whether to approve the vouchers."  95 F.Supp.2d at 638-39  (emphasis added).  If Lewis had testified that he or some other governmental official took the truth or falsity of the defendants' certifications into account in deciding whether to approve the vouchers, it would be a different matter.  Thus, without the majority's helpful declaration of materiality as a matter of law, the government has no evidence to support its position.

In contrast, the district court found, "amply supported" by "undisputed evidence," that HUD's decision to pay appellees' HAP vouchers "was not linked to their certification as to the condition of the apartments."  <u>United States v. Southland Mgmt. Corp., Inc.</u>, 95 F.Supp.2d 629, 637 (S.D. Miss. 2000).  The court's assessment of the undisputed evidence is worth quoting at length:

> It is clear from the evidence that HUD, in accordance with the terms of its standard HAP contract, <u>may</u> elect to discontinue housing assistance payments if an owner, after notice by HUD that the property is not "decent, safe, and sanitary," fails to implement a corrective action plan acceptable to HUD.  <u>However, it is equally clear not only that that discontinuance of payments is not required but also that even when HUD considers that a property is not 'decent, safe, and sanitary,' it is HUD's normal practice, in keeping with the parties' respective rights and obligations under the HAP</u>

64

<u>contract, to allow owners to continue to receive subsidies while working to correct deficiencies that HUD has identified.</u>  Indeed, it is evident from the proof that HUD makes housing assistance payments with the expectation that the owner/recipients will use those payments to bring their property up to standard. Further, as the Government points out in its own submission, in view of the practical realities of Section 8 housing programs, HUD often elects to continue payments for a particular property despite knowledge that the property, contrary to the owners' HAP voucher certification, does not meet HUD's "decent, safe, and sanitary" standard since the alternative – discontinuance of payments – may work to the detriment of tenants.  The point, of course, is that because the evidence reflects that HUD, as a matter of policy and practice, admittedly routinely makes Section 8 housing assistance payments to owners of Section 8 property irrespective of whether the property is in a "decent, safe, and sanitary" condition, then the owners' certification as to the condition of the property would not be "material" to HUD's decision to pay.

. . .

On this issue, the evidence positively demonstrates beyond reasonable question that at the time of defendants' submission of the challenged vouchers and HUD's approval of those vouchers, HUD, based on its own annual inspections of the property, knew full well of the very conditions of the property which it now claims made the property not "decent, safe, and sanitary."  HUD, through its contract inspector, Management Solutions of America, Inc., conducted annual inspections of the Jackson Apartments for each of the years defendants' HAP Contract was in effect; and for each of the years from August 1993 to May 1997, based on conditions found to exist at the property by HUD's inspector, the apartments received "below average" or "unsatisfactory" physical inspection reports from HUD.  HUD's inspector furnished to HUD's project manager responsible for the apartments a copy of his inspection report in which he detailed his specific findings and indicated repairs which needed to be made in order that the property would satisfy HUD's minimum housing quality standards.  Vicki Gross, the project manager for the time period at issue, in turn,

furnished the inspection report to her superiors who, in turn, forwarded the inspection reports to defendants or their managing agent, and advised defendants and/or their agent of those repairs which were required to be made and requested that defendants and/or their agent inform HUD of the actions that would be taken, along with a timetable, to correct the deficiencies which HUD had identified. At her deposition, Vicki Gross, who testified as HUD's representative, explained that properties receiving "below average" and "unsatisfactory" physical condition ratings in inspection reports are not "decent, safe, and sanitary." And indeed, the conditions upon which the Government makes its affirmative allegation that the Jackson Apartments were not in a "decent, safe, and sanitary" condition are those same specific deficiencies which HUD's inspector identified and which led him to assign the apartments the "below average" and "unsatisfactory" ratings. From this evidence, there can be no question but that HUD was fully aware of the conditions of the apartments, and specifically, of those deficiencies which it asserts made the apartments not "decent, safe, and sanitary." And yet HUD, which was aware that defendants continued to submit HAP vouchers and receive payments throughout this time, allowed those payments to continue. HUD's knowledge of the true conditions utterly belies HUD's contention that the certifications were material, confirms HUD's policy and practice of allowing housing assistance payments on properties that it knows are not decent, safe and sanitary, and dooms its claim against defendants.

95 F.Supp.2d at 637-40 (footnotes omitted) (second and third emphases added). HUD followed its usual procedures, paid the subsidies year after year, acquiesced in the owners' plowing the entire rent subsidy into the property, and now claims to be defrauded! As a sister court of appeals put it, this claim is "absurd." Lamers, 168 F.3d at 1020. Simply, there can be no

finding of materiality, much less materiality as a matter of law, on this record.

## II. The defendants did not "knowingly" present false claims for payment.

A defendant may be liable for a civil false claim by "knowingly" presenting such a claim, 31 U.S.C. § 3729(a)(1), but specific intent to defraud is not required, 31 U.S.C. § 3729(b). The question here is whether the government's knowledge of the falsity of a statement in a claim can defeat FCA liability for that statement on the ground that the claimant did not act "knowingly." The majority hold that government knowledge need not defeat a civil FCA claim, but that government knowledge may be relevant to whether a defendant had the *mens rea* required by the statute.[38] Applying this standard, the majority conclude that there is an issue of material fact as to whether these defendants had the requisite *mens rea*.

The majority and I differ over the scope of the government knowledge defense rather than its existence. Citing no authority, the majority arbitrarily cabins this defense,

---

[38] As a matter of pure logic, the government's knowledge affects not only the question whether the defendant "knowingly" presented a false claim, but also the question whether the claim was false. The Seventh Circuit may have captured the relationship when it observed that one cannot meaningfully discuss falsity without implicating the knowledge requirement. Lamers, 168 F.3d at 1018. The court went on to hold that government knowledge precluded an actionable false claim.

67

excluding from the Act's coverage in a claim brought by the government (as opposed to a *qui tam* action)

> primarily . . . the rare situation where the falsity of a claim is unclear and the evidence suggests that the defendant actually believed his claim was *not false* because the government approved and paid the claim with full knowledge of the relevant facts.

Majority Opinion at 2613. (emphasis in original)  As I read the cases, however, the impact of government knowledge is (a) fact-specific, (b) not susceptible to a tidy formula, and (c) based on the understanding that the FCA reaches only the "knowing presentation of what is known to be false."  United States ex rel. Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1478 (9th Cir. 1996) (citation and internal quotation marks omitted). There is no statutory or caselaw basis for distinguishing, as the majority do, between government-initiated and *qui tam* FCA cases. And there is no basis for limiting the defense as the majority has done.  The majority's reticence cannot be squared with caselaw.  It is plain that government knowledge can defeat an FCA claim at the summary judgment stage.  Id. at 1477-79.  From my perspective, only two possibilities would seem to justify imposing liability in the face of government knowledge that a claim is false: either the person making the statement did not know that the government knew it was false, or the person making the statement was colluding with a government employee who also knew the claim was false.  In these situations, the claimant

68

would be "knowingly" submitting a false claim. Here, however, the defendants knew that the government knew the true condition of their property. Compare United States ex rel. Durcholz v. F.K.W., Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA.").

Contrary to the majority's finding of a material fact issue on whether the defendants acted "knowingly", there is no doubt that the government was aware that this apartment house was deteriorating for several years preceding its foreclosure. HUD inspectors repeatedly rated the property as "below average" or "unsatisfactory." HUD's inspector found the management employees cooperative, however, and the record reflects that when the management was advised to make certain improvements and repairs, it often did so to the extent money was available. The types of problems now emphasized by the government as creating substandard living conditions were not hidden defects – photographs of the property taken by the mortgagee inspectors are in the record, and HUD reviewed the mortgagee inspections. Nevertheless, HUD continued to subsidize the operation of these apartments. Evidence of foot-dragging by the apartment management may exist,

69

but that is not the same as concealment.  The yearly inspection

reports show that repairs were being made regularly, and HUD knew

this, as it also knew that its rent subsidies were insufficient

to allay the deterioration.

In finding a fact issue as to government knowledge, the

majority reason that HUD knew something about the apartments'

condition, but that the owners knew more.  This is unpersuasive.

The district court correctly parried the government's similar

contention by pointing out that HUD now relies on exactly the

deficiencies stated in its annual inspection reports to condemn

the owners' certifications of compliance with the "decent, safe

and sanitary" standard.[39]  HUD may not have known as much about

the property, but because its knowledge was sufficient to

undergird this civil FCA case -- and it still subsidized the

apartments for years -- summary judgment should be affirmed.  The

owners did not knowingly submit false claims.

## III. Are the owners' defenses based on estoppel against the government?

The majority opinion sets up, only to pommel, what it

describes as the owners' "effective" contention that the

government has waived or is estopped to rely on remedies under

the civil FCA.  Not only does estoppel not lie against the

---

[39]    Indeed, the U.S. Attorney threatened in March 1996 to sue the owners for FCA penalties based on their false certifications, but HUD subsidies continued until the property was foreclosed in July 1998.  And after that, HUD had the owners manage the apartments for another three months.

government, according to the majority, but the government's enforcement alternatives would be seriously constrained by disallowing its opportunity to recover treble damages and penalties against the owners.

Unfortunately, this discussion rests on a complete mischaracterization of the owners' position. While the owners vigorously dispute that the elements of a civil FCA claim lie against them and the impact of the government's acquiescence and knowledge of the apartments' condition, nowhere do they assert a waiver or estoppel argument. The majority's position is untenable.[40]

Even if relevant, however, the majority's estoppel argument proves too much. In this case, the government is suing the owners on a theory of wrongful conduct in excess of mere breach of contract, and the owners are arguing, not that the government is estopped from holding them liable on this theory, but that they are not liable as a matter of law. In other words, the owners do not raise estoppel as a defense to the government's cause of action; they contend that in light of the government's

---

[40]     In a dubious rhetorical flourish, the majority also mischaractize the appellees' position as suggesting that the government's awareness that a claimant's submission was false might affect the truth or falsity of the claim. The majority tartly add: "A lie does not become the truth simply because the person hearing it knows that it is a lie." The majority confuse the vernacular "truth" or "falsity" of a claim with an actionable FCA false claim, whose components also include materiality and "knowing" falsehood. While the owners do not concede the vernacular falsity of their vouchers, they have disputed the existence of actionable civil FCA claims.

71

knowledge and its course of dealing, the government has failed to establish the necessary elements of that cause of action, namely, the "knowing" submission of "material" "false claims." The owners' position is thus entirely distinguishable from the cases cited in the majority opinion. All but one of those cases deal with private persons who invoked estoppel in an attempt to recover money from the government.[41] In the other case, the issue (equally distinguishable from the issue in this case) was whether the government was estopped from enforcing a contract by collecting on a debt. The court held, not that estoppel was unavailable, but merely that the debtor had not met his burden to offer sufficient proof of equitable estoppel to withstand summary judgment. See United States v. Bloom, 112 F.3d 200, 205-06 (5th Cir. 1997).

Certainly, in a conventional fraud action initiated by the government against a private party, it would make no sense to conclude that estoppel considerations require a court to

---

[41] See Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 426, 110 S.Ct. 2472 (1990) (denying recovery of disability benefit funds by retiree who received erroneous information from federal agency that led him to lose six months of benefits) ("judicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized"); Fed. Crop. Ins. Corp. v. Merrill, 332 U.S. 380, 382, 386 (1947) (denying recovery by farmers of funds from federal crop insurance program where farmers bought insurance after Government falsely assured them that their entire crop was insurable); Linkous v. United States, 142 F.3d 271, 277 (5th Cir. 1998) (rejecting plaintiff's argument, in Federal Tort Claims Act action, that United States should be equitably estopped from denying doctor's status as United States employee where doctor was in fact an independent contractor; dismissing FTCA action for lack of subject matter jurisdiction on ground that FTCA's waiver of sovereign immunity extends only to suits for acts committed by Government employees within scope of their employment).

72

disregard the government's knowledge or conduct in considering whether the government had actually been defrauded.  But that seems to be what the majority is asserting in this case.  The majority's reasoning reinforces the theme permeating the opinion that government knowledge and repeated approval of a private person's requests for reimbursement, unaccompanied by any illegal collusion, does not bar the United States from pursuing treble damages and penalties for facts of which the government was perfectly aware when the government approved the requests.

Even if the majority's broad estoppel rationale should apply to cases in which the government seeks money against private persons, this rationale should not apply to a civil FCA action, which involves the possibility of treble damages liability.  Thus, this case is not merely one in which "the government seeks to recover <u>funds spent contrary to the will of Congress</u>."  Majority Opinion at __ (emphasis in original).  Instead, the government in this case seeks punitive damages from private persons in excess of any recovery of its funds.  The majority concede that government knowledge is relevant to and may defeat the defendant's "knowing" presentation of a false claim.  It is inconsistent also to assert, as the estoppel argument does, that government knowledge cannot in some circumstances deprive the government of a civil FCA remedy.

Finally, the majority assert that making government knowledge a bar to FCA liability would put HUD to an election of remedies that nothing in the Section 8 subsidized housing regime – statute, regulations, or contract – necessitates. This argument simply begs the antecedent question whether a civil FCA cause of action, and thus the basis for an FCA remedy, exists in the first place when the government knew of the owners' alleged false claims. This argument also fails to address the owners' contention that the majority's reading of the FCA essentially condones government threats of FCA liability to force investors in federally subsidized housing projects to contribute their own money to make up shortfalls in maintenance funds. Compare Christopher Village Limited Partnership v. Retsinas, 190 F.3d 310, 316 (5th Cir. 1999).[42]

The majority repeatedly engage in appellate factfinding by asserting, without any foundation in the record, that the Government sought a civil FCA remedy only after the "cooperative process" between HUD and the owners had "broken down". It is true that the owners eventually ceased making mortgage payments,

---

[42] Cf. John T. Boese, Civil False Claims and Qui Tam Actions, § 2.03[F][3] ("Government Knowledge of False Claims Act Allegations"), at 2-108 - 2-109 (2nd ed. 2001 Supp.) ("[T]he strongest case for government knowledge precluding liability is one where an agency insists on continued performance while independent investigators believe this continued performance involves continued false claims, so that the contractor seems forced to choose between further False Claims Act liability [and] breach of contract. . . . [P]rosecution should not be permitted where a contractor is not free to terminate a contract or otherwise cease making false claims.").

but HUD continued to use their management services for several months after it had foreclosed. HUD must not have considered the owners' services as reprehensible then as it does now. Moreover, the owners indisputably applied all of their HUD subsidies and tenant rents to service and maintain the apartments and the associated mortgage after fiscal year 1993. The government has never asserted any dishonest conduct by the owners. Apparently, HUD's subsidies were too low to cover the project's costs. Only by using their imagination -- wholly outside the record -- can the majority attribute deceptive conduct to these owners or victimization to a government agency that was either under-funded or unwilling to support the project properly. I do not suggest that these circumstances justify estoppel against the government. They do, however, counsel extreme care in applying the powerful punitive weapon of civil FCA liability.

## III. What is "decent, safe and sanitary" housing?

While refusing to rule on the dispositive issue, not decided by the district court, whether the governing HUD regulations are so imprecise concerning "decent, safe and sanitary housing" that they cannot provide the basis for an FCA claim,[43] the majority here offers at least a ray of hope to the

---

[43] There is no applicable regulatory definition of decent, safe and sanitary housing. The government has cited a regulation pertaining to a different HUD program, see Southland Mgmt. Corp., 95 F.Supp.2d at 635 n.7 (citing, inter alia, 24 C.F.R. § 886.113), cited in Majority Opinion at __, but the majority opinion correctly recognizes its inutility.

75

owners.  The majority posits that while this housing standard is subject to differing interpretations, the owners escape civil FCA violations if their interpretation of the standard was not unreasonable.  Further, the majority do not preclude the possibility of a grant of summary judgment on this issue on remand.

My difference with the majority opinion is narrow.  In assessing the meaning of the "decent, safe and sanitary" standard, I would not focus on the number of times the owners certified the apartments as, and HUD paid their vouchers for, "decent, safe and sanitary" housing; such evidence is tautological.  Instead, the inspection records and HUD's failure ever to inform the owners that they violated the "decent, safe and sanitary" standard seem far more probative.  HUD's periodic housing inspection reports rated the apartments as merely "below average" rather than "unsatisfactory" throughout the period covered by this suit until November 1996.  Further, the mortgagee's reports found the apartments "satisfactory" until April 1997, given the high-crime neighborhood in which they were located and "the lack of funds."  HUD did not place the apartments on its list of "troubled" properties until November 1997.  If the crux of this issue is whether the appellees' interpretation of the standard is reasonable, how can a fact issue exist when HUD never told the owners during the period for

76

which HUD now sues that the apartments violated the standard? While I concede that wholly unreasonable and self-serving interpretations of regulatory or contract provisions might run afoul of the civil FCA, private parties should not be exposed to liability when the minimum standard consists of adjectives whose meaning is fairly debatable. <u>Lamers</u>, 168 F.3d at 1018 ("imprecise statements or differences in interpretation growing out of a disputed legal question are . . . not false under the FCA") (citing <u>Hagood</u>, 81 F.3d at 1477-78).

## IV.  Conclusion.

For the reasons stated above, I would affirm the summary judgment granted by the district court.  The majority decision is unfortunate for the owners, although I believe they have a compelling case to present at trial.  It is even more unfortunate for future government contractors or beneficiaries who must reckon with the threat of punitive sanctions for breach of vague provisions in complex regulatory schemes; for non-material certifications of compliance; and for "false claims" the government knowingly (and non-collusively) paid.

I respectfully **DISSENT**.